## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| DERRICK HAYNES, THOMAS M. PERCONTI, CHARLES B. HILL, and FRED ROGERS, on behalf of themselves and a class of others similarly situated | ) ) ) ) ) | |
| | ) | Case No. 08-4834 |
| Plaintiffs, | ) ) | Honorable Suzanne B. Conlon |
| vs. | ) ) | Magistrate Judge Maria Valdez |
| THOMAS DART, et al., | ) ) | |
| Defendants. | ) ) | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR SECOND MOTION FOR CLASS CERTIFICATION AND FOR APPOINTMENT OF COUNSEL PURSUANT TO RULE 23 OF THE FEDERAL RULES OF CIVIL PROCEDURE

Dated:  December 4, 2009

Mark A. Flessner (ARDC #6194599)
Anthony T. Eliseuson (ARDC #6277427)
SONNENSCHEIN NATH & ROSENTHAL LLP
233 South Wacker Drive
Suite 7800
Chicago, Illinois 60606
(312) 876-8000
(312) 876-7934 (fax)
mflessner@sonnenschein.com
aeliseuson@sonnenschein.com
*Appointed attorneys for Plaintiffs Derrick Haynes,*
*Thomas M. Perconti, Charles B. Hill, and*
*Fred Rogers*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ..................................................................................................1

BACKGROUND ..................................................................................................2

I.    The Causes of Action and Summary of Generalized Evidence Already Obtained
Supporting Those Claim. ....................................................................................2

    A.    Failure to provide adequate mental health treatment. ...............................3

        1.    Defendants refuse to change policies that they know lead to
increased suicide attempts and risk, and engage in conduct that has
"significantly" increased the number of suicide attempts at CCJ. ...............3

        2.    There is a universally recognized budget problem that has led to a
lack of necessary treatment, which deprives the detainees of proper
mental health treatment. ...............5

        3.    The quality of mental health treatment received by detainees is
uniformly deficient. ...............6

        4.    Defendants fail to require "Psych" training and such training is
inadequate. ...............7

        5.    The decision to move the "Psych" detainees out of the RTU was
made against the medical advice of the Cermak "Psych" staff and
undermined the treatment of the "Psych" detainees. ...............8

    B.    Inhumane conditions of confinement ...............11

        1.    Defendants fail to provide satisfactory uniform and linen
exchange. ...............11

        2.    Defendants fail to provide adequate temperature control leading to
excessive conditions. ...............13

        3.    Rodents, pests, and other "deplorable" conditions that Defendants
fail to correct. ...............13

        4.    Medicated detainees are forced to sleep on the concrete floors for
11-12 hours a day, leading to severe physical injuries. ...............15

    C.    Interfering with the grievance process and obstructing access to the courts. ........16

    D.    Counts that cover all three categories. ...............16

II.    The New Class And Subclass Definitions. ...............16

ARGUMENT ........................................................................................................19

I.      The Class And Subclasses Are Sufficiently Defined.........................................19

II.     The Proposed Class And Subclass Meet All The Requirements Of Rule 23(a)...............20

        A.      Numerosity, commonality, and typicality are met.................................20

        B.      Plaintiffs Are Adequate.........................................................20

III.    Class Certification Is Also Appropriate Under Each Of The Three Rule 23(b)
        Subprovisions....................................................................................21

        A.      Certification under Rule 23(b)(3) is appropriate. ................................21

                1.      Predominance is met. ....................................................22

                        a.      Common mental health issues predominate. ................................23

                        b.      Common conditions of confinement predominate.........................23

                        c.      Common grievance and access issues predominate......................25

                        d.      All claims involve common questions of whether
                                Defendants violated the Class member's constitutional and
                                other rights. ...................................................26

                2.      Superiority is met. ....................................................27

        B.      Certification is also appropriate under Rules 23(b)(1) and (b)(2). ......................28

                1.      The Third Amended Complaint sufficiently specifies the injunctive
                        relief sought. ........................................................29

                2.      The *Harrington* and *Duran* Consent Decrees are not inconsistent
                        with the relief sought by the Class............................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bradley v. Harrelson*,
    151 F.R.D. 422 (M.D. Ala. 1993) ..................................................................... 28

*Bzdawka v. Milwaukee County*,
    238 F.R.D. 469 (E.D. Wis. 2006) ..................................................................... 28

*Calvin v. Sheriff of Will County*,
    2004 U.S. Dist. LEXIS 8717 (N.D. Ill. May 17, 2004) .................................. 26

*Carnegie v. Household International, Inc.*,
    376 F.3d 656 (7th Cir. 2004) ......................................................................... 22

*Dean v. Coughlin*,
    107 F.R.D. 331 (S.D.N.Y. 1985) ..................................................................... 28

*Dunn v. City of Chicago*,
    231 F.R.D. 367 (N.D. Ill. 2005) ..................................................................... 26

*Flynn v. Doyle*,
    2007 U.S. Dist. LEXIS 22659 (E.D. Wis. Mar. 14, 2007) ............................ 28

*Gary v. Sheahan*,
    1999 U.S. Dist. LEXIS 5616 (N.D. Ill. Mar. 31, 1999) .................................. 27

*Harper v. Sheriff of Cook County*,
    2008 U.S. Dist. LEXIS 43777 (N.D. Ill. May 29, 2008) ................................ 26

*Hassine v. Jeffes*,
    846 F.2d 169 (3d Cir. 1988) ........................................................................... 28

*Johns v. DeLeonardis*,
    145 F.R.D. 480 (N.D. Ill. 1992) ..................................................................... 26

*Jones 'El v. Berge*,
    2001 U.S. Dist. LEXIS 25625, 2001 WL 34379611 (W.D. Wis. 2001) ......... 28

*Penland v. Warren Co. Jail*,
    797 F.2d 332 (6th Cir. 1986) ......................................................................... 28

*Phipps v. Sheriff of Cook County*,
    249 F.R.D. 298 (N. D. Ill. 2008) ..................................................................... 26

*Rahim v. Sheahan*,
    2001 U.S. Dist. LEXIS 17214 (N.D. Ill. Oct. 19, 2001) ................................ 27

*Ramirez v. Palisades Collection LLC*,
    250 F.R.D. 366 (N.D. Ill. 2008) .............................................................. passim

*Ramos v. Lamm*,
    639 F.2d 559 (10th Cir. 1980) ....................................................................... 28

*Robert E. v. Lane*,
    530 F. Supp. 930 (N.D. Ill. 1981) ................................................................... 28

*Vodak v. City of Chicago*,
    2006 U.S. Dist. LEXIS 30052 (N.D. Ill. Apr. 17, 2006) ................................. 26

*Walker v. Bankers Life & Cas. Co.*,
    2007 U.S. Dist. LEXIS 73502 (N.D. Ill. Oct. 1, 2007)............................. 21, 28

*Young v. County of Cook*,
    2007 U.S. Dist. LEXIS 31086 (N.D. Ill. Apr. 25, 2007) ................................. 26

## Other Authorities

42 U.S.C. § 1983 .............................................................................................. 26

Fed. R. Civ. P. 23(a) ...................................................................................... 1, 2

Fed. R. Civ. P. 23(a)(1) ................................................................................ 1, 20

Fed. R. Civ. P. 23(a)(2) ................................................................................ 1, 20

Fed. R. Civ. P. 23(a)(3) ................................................................................ 1, 20

Fed. R. Civ. P. 23(a)(4) ....................................................................................... 1

Fed. R. Civ. P. 23(b) ........................................................................................... 1

Fed. R. Civ. P. 23(b)(1).............................................................................. passim

Fed. R. Civ. P. 23(b)(2).............................................................................. passim

Fed. R. Civ. P. 23(b)(3).............................................................................. passim

Fed. R. Civ. P. 23(g) ......................................................................................... 21

## INTRODUCTION

This Court previously found that Plaintiffs satisfied the Rule 23(a) requirements of numerosity, commonality, and typicality.  (Class Cert. Opinion at 9-13 (finding Rule 23(a)(1), (2), and (3) satisfied; *see also* Pls.' First Class Cert. Mem. at 5-6).)[1]  Indeed, this Court noted that this case, at a quick glance, "seems ideal for classwide equitable relief," and that "plaintiffs' claims relate to a general pattern of defendants' conduct toward class members."  (Class Cert. Opinion at 14.)  The Court, however, determined that Plaintiffs failed to:  (1) adequately define the class, and (2) specify the injunctive relief sought, which precluded the Court from fully analyzing the requirements of Rule 23(b)(1)-(3) and Rule 23(a)(4).  (*Id.* at 14-20.)

Plaintiffs' Third Amended Complaint[2] sufficiently defines the Class and Subclasses and specifies the injunctive relief sought.  Based upon these new allegations, as discussed below, Plaintiffs have demonstrated that a class is properly certifiable under Rule 23(a)(4) and under all three subprovisions of Rule 23(b), including Rule 23(b)(3), because a class action is superior and common issues predominate.  The Plaintiffs and the class members have been exposed to Defendants' wrongs through a pattern of uniform conduct.  Several of Defendants' employees and agents have admitted that detainees are all subjected to this same conduct, and that the conditions of confinement are the same throughout the divisions of CCJ.  Thus, Plaintiffs can— and will—establish their claims based upon generalized evidence showing that Defendants' actions and policies are unconstitutional.

---

[1] July 29, 2009 Opinion, Docket Entry # 130 ("Class Cert. Opinion); and Plaintiffs' Memorandum of Law in Support of Motion for Class Certification, filed on March 25, 2009, Docket # 91 ("Pls.' First Class Cert. Mem.").  Plaintiffs incorporate their prior Memorandum of Law and exhibits herein by reference.

[2] Plaintiffs' Third Amended Class Action Complaint ( "TAC" or "Third Amended Complaint").

Accordingly, Plaintiffs respectfully request that this Court certify this action under

Rules 23(a), 23(b)(1), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure so that *all*

detainees, in one suit, can establish liability against the Defendants for conduct that the United

States Department of Justice ("DOJ") has concluded violates the detainees' Constitutional rights

in myriad ways.  (DOJ Report at 9 ("CCJ fails to adequately protect inmates from harm and

serious risk of harm from staff and other inmates; fails to provide inmates with adequate medical

and mental health care; fails to provide adequate suicide prevention; fails to provide adequate

fire safety precautions; and fails to provide safe and sanitary environmental conditions").[3]

Indeed, as discussed below, the deposition testimony already obtained in this litigation confirms

the conclusions of the DOJ, and establishes that Defendants are uniformly depriving the Class

members of their constitutional and other rights.

## BACKGROUND

I.    **The Causes of Action and Summary of Generalized Evidence Already
      Obtained Supporting Those Claim.[4]**

Plaintiffs filed this lawsuit on behalf of themselves and a class of all detainees at Cook

County Jail ("CCJ") asserting twenty causes of action.  (TAC ¶¶ 120 to 240.)  The twenty counts

can be categorized as follows:  (1) Defendants are failing to provide the Class with adequate

mental health treatment, including failing to adequately protect the Class from suicide;

(2) Defendants are housing the Class in inhumane and unconstitutional conditions of

confinement; and (3) Defendants are obstructing Plaintiffs' and the class's ability to file

---

[3] July 11, 2008 Report of the Civil Rights Division of the Department of Justice at 9 (hereinafter "DOJ Report"), a copy of which is attached to the Third Amended Complaint as Exhibit A.

[4] As this Court knows, discovery is on going in this case, and therefore, this summary of certain deposition testimony and evidence already obtained by Plaintiffs is merely intended to demonstrate that the Class's claims can be proven by generalized evidence, but it is by no means exhaustive of all the evidence that will be used to support those claims.

grievances about such conduct and conditions, and also obstructing access to the courts to seek

redress.[5]

**A.      Failure to provide adequate mental health treatment.**

Counts I-IV, VII-X, and XII-XIV are being asserted by all or some of the three

Subclasses that relate to mental health treatment.  (*See* TAC at ¶ 106 (identifying which Counts

are being pursued by the Class or Subclasses).)  These claims are all supported by a common set

of facts, which is shared by the class and subclasses respectively.  Some examples of the

generalized evidence already adduced in this case includes:

**1.      Defendants refuse to change policies that they know lead to
increased suicide attempts and risk, and engage in conduct
that has "significantly" increased the number of suicide
attempts at CCJ.**

The frequency of suicide attempts has gone up "significantly" since the RTU transfer

occurred, which is a concern of the Cermak "Psych"[6] staff.  (Ex. 1, Taylor Dep. Tr. at 195:3-15;

200:15-19.)[7]  The CCJ's policy of distributing razors at night to suicidal detainees and then not

collecting those razors for several hours (if ever) is a problem recognized by the Cermak staff,

yet that practice continues and has led to injuries.  (Ex. 2, Walker Dep. Tr. at 118:17-119:5.)

Indeed, the razors are not even collected 25% of the time, and many detainees have razor blades

in their cells.  (Perconti Dep. Tr. at 146:8-18.)[8]

---

[5] For a further discussion of these categories of claims, see Pls.' First Class Cert. Mem. at 2-5.

[6] The Defendants' employees and Defendants' policies refer to mentally ill detainees and related
programs by the term "Psych," which will be adopted in this Memorandum.

[7] Ms. Taylor and Ms. Walker are both mental health specialists at the CCJ.

[8] Copies of the deposition transcripts of the four named Plaintiffs were previously filed into the
record by Defendants, at Docket Entry # 120.  Thus, Plaintiffs have not filed additional copies,
but will provide copies of these transcripts to the Court upon request.  Plaintiff can also provide
full-size (non-miniscript) versions of the transcripts that are attached as Exhibits upon request.

Similarly, Defendants are aware of the very common practice of "hoarding," in which detainees do not swallow their medication but instead keep it and store up a supply that they can either sell, or use in an attempt to overdose and commit suicide.  (Ex. 1, Taylor Dep. Tr. at 189:20-193:9 (discussing "hoarding," and that numerous suicide attempts have occurred through this practice, which continues to occur); Ex. 2, Walker Dep. Tr. 103:17-104:14 (noting hoarding is a common practice and that one of the reasons is for suicide attempts).)  This problem has been referenced in minutes from a Directors Meeting between Cermak & the CCDOE dated 1/4/08, yet nothing has been done to stop the hoarding practice.  (*See* Exhibit 3.)

This lack of concern about suicide risk comes from the very top of the chain of command.  Defendant Godinez, the second ranking officer in the Sheriffs' Department, is believed to have stated that "CCJ has one of the lowest suicide rates in the country, we can afford a few deaths," as part of his justification for closing the RTU.  (TAC at ¶ 48.)  Two of the officers already deposed in this case testified that they have been told by other *officers* that Defendant Godinez made this statement during a roll call meeting.  (Ex. 4, Steffan Dep. Tr. at 76:14-17; Ex. 5, Hand Dep. Tr. at 81:17-82:9.)

The level of violence amongst the "Psych" detainees has risen significantly as well since the RTU transfer.  (Ex. 1, Taylor Dep. Tr. at 198:9-200:19 and Ex. 2, Walker Dep. Tr. at 106:9-108:20 (noting fights rarely occurred at the RTU, less than once a month, and are occurring on a near weekly basis since the RTU transfer occurred, and that this increase in fighting is a concern of the mental health staff at Cermak and the correctional officers).)  This increase in violence is not only harmful in and of itself, but also increases the likelihood of suicide by detainees that are fearful of such violence.

**2.      There is a universally recognized budget problem that has led to a lack of necessary treatment, which deprives the detainees of proper mental health treatment.**

A core problem is the lack of funding for the CCJ and Cermak, which leads to, among other problems, a lack of staffing, cancellation of services, including therapy sessions, inadequate linen and clothing exchange, and cancellation of recreation sessions.  The witnesses in this case have repeatedly complained about the lack of staffing, and indicated that this problem has led to a failure to properly treat the "Psych" detainees, and other major safety issues. (*See generally* Ex. 2, Walker Dep. Tr. at 146:9-21.)  As one officer testified, the lack of staffing causes him to be concerned for his safety, the safety of other officers, and of the detainees.  (Ex. 4, Steffan Dep. Tr. at 38:12-39:1.)  Another officer noted that officers frequently complain about being understaffed and admit that they are unable to do their job as well as they could if there was proper staffing.  (Ex. 6, Maas Dep. Tr. at 78:22-79:3.)

The lack of staffing and other issues has led to cancellation of group therapy programs, a problem that has worsened since this lawsuit was filed, and since the DOJ issued its report.  (Ex. 5, Hand Dep. Tr. at 73:3-23, 273:18-274:7 (testifying that the group therapy programs are being frequently cancelled in the June-July 2009 time frame due to staff shortages; Ex. 7, Cashen Dep. Tr. at 136:21-138:5 (discussing issues with group therapy after RTU transfer); *see also* Ex. 5, Hand Dep. Tr. at 272:9-273:5 (stating that his supervisors have told him "[t]hat [the S]heriff's office has cut staff tremendously within the last couple of months; [which] makes [their] job very difficult").)

The person in charge of scheduling officers for Division 10 admitted that minimum staff requirements are not met on more than a weekly basis, and often on a daily basis.  (Ex. 7, Cashen Dep. Tr. at 16:22-18:2 (discussing failure to meet the minimum staff requirements on a near daily basis, and stating that overtime is required to be used to cover those shortages).)  But the

overuse of overtime hours does more harm than good, by simply expending more of the already

deficient budget, which causes additional program cuts and further deteriorates the treatment of

the detainees.  (Ex. 7, Cashen Dep. Tr. at 57:9-10 ("there is never enough money in the

budget").)  As one Sergeant testified, staff shortages are a daily occurrence, and recreation is

often cancelled due to staff shortages.  (Ex. 8, Loizon Dep. Tr. at 55:20-56:8.)  Indeed, the

shortages are so severe that Sergeant Loizon is often required to cover not only his assignment,

but the assignment of *three other sergeants* meaning he is doing the work that should be done by

four sergeants.  (*Id.* at 57:24-58:12.)

Budget cuts have also caused mental health specialists to be laid off and reduces the

number of sessions for detainees, which further undermines the mental health treatment of the

Class members.  (Ex. 5, Hand Dep. Tr. at 73:3-23, 273:18-274:7; Ex. 1, Taylor Dep. Tr. at

77:12-24 (stating she would like to provide more sessions, and updated materials for group

sessions, for detainees).)  The staffing and budget problems also interfere with the detainees

ability to get their medication, and to get them in a timely manner.  (Exhibit 9.)  As an internal

memorandum from the nursing staff of Division X notes, there is a nursing shortage and as a

result "tiers are not getting medicated and/or tiers are getting medicated too late.  This is a

serious problem for detainees that must be medicated at specific times of the day, for medication

to be effective."  (*Id.*)

### 3.     The quality of mental health treatment received by detainees is uniformly deficient.

Defendants fail to provide the Class members with adequate mental health treatment in

myriads ways.  This includes the budget issues discussed above.  Additional examples include:

Detainees are not provided with round the clock mental health specialists, which the

Cermak staff almost universally believes is necessary.  (Ex. 1, Taylor Dep. Tr. at 196:23-

197:14.)  Even correctional officers testified that the availability of counseling and the response

rate if a detainee needs urgent or emergency care is worse in Division 10 than it was in the RTU. (Ex. 5, Hand Dep. Tr. 139:19-140:6.)

The quality of the treatment by the psychologist and psychiatrists is patently deficient. "Psych" detainees rarely see their treating psychologist or psychiatrist except when such a visit is necessary to renew that detainee's prescriptions.  (Ex. 1, Taylor Dep. Tr. at 50:1-22 (agreeing that more than 90% of the time detainees only are allowed to see a psychiatrist when it is time for their prescriptions to be renewed).  Those visits can hardly be called therapeutic -- as most such visits are akin to an assembly line where several detainees are lined up and quickly sent into a room and given a renewal prescription without any medical evaluation at all.  (Perconti Dep. Tr. 99:15-100:20, 101:19-102:4.)  Indeed, the "evaluation" forms are sometimes pre-filled before the detainee sees the doctor, and the doctor does not adjust the prescription even when told the detainee is experiencing problems with the medication.  (Perconti Dep. Tr. at 100:21-101:8.) The treatment the detainees do receive is from "Mental Health Specialists" who are not licensed professionals, and who are not required to, and often do not, review the medical charts to determine the true diagnoses of the detainees.  (Ex. 1, Taylor Dep. Tr. at 8:18-24 (not licensed), *id*. at 84:19-86:1 (noting there is no requirement that mental health specialists review charts or determine the actual diagnoses of the detainees).)

> **4.      Defendants fail to require "Psych" training and such training is inadequate.**

The Defendants also fail to require Psych training for all correctional officers that are assigned to "Psych" tiers, and officers that do not want the Psych training can still be assigned to such tiers.  (Ex. 4, Steffan Dep. Tr. at 12:7-11; 111:10-16; *see also* Ex. 1, Taylor Dep. Tr. 80:4-10 (stating that not all the officers are "Psych" trained).)  Even those officers that do *voluntarily* take the Psych training think it is inadequate, not sufficiently detailed, and would like more

advanced training.  (Ex. 4, Steffan Dep. Tr. at 11:19-12:12; Ex. 5, Hand Dep. Tr. at 20:13-19.)[9]

Further, officers that are interested in the Psych training are often denied the opportunity

repeatedly, for example Officer Steffan volunteered for the training approximately 5 times before

he was allowed to take it (and during this time he was assigned to a Psych unit).  (Ex. 4, Steffan

Dep. Tr. at 110:11-111:5.)

> ## 5. The decision to move the "Psych" detainees out of the RTU was made against the medical advice of the Cermak "Psych" staff and undermined the treatment of the "Psych" detainees.

The decision to close the RTU and move the RTU Subclass members to a facility that

lacked adequate mental health treatment facilities and programs is not only a common issue, but

was a decision that the Cermak mental health staff uniformly opposed, because of their strong

opinion that it would be detrimental to the mental health of the detainees.  (Walker Dep. Tr. at

80:22-81:19.)  Indeed, even correctional officers share this view.  (Hand Dep. Tr. 127:6-132:24

(stating, from a security standpoint, RTU never should have been closed, that it was better for the

detainees and better for security staff, including for medical reasons).)

The Isaac Ray Center[10] *repeatedly* sent written notices explaining the risks and the

minimum measures necessary to protect the class.  (Exhibit 10 (collection of several

communications from the Isaac Ray / Cermak mental health staff to the Sheriff's Office).)  For

example, an impact study authored by Dr. Eileen Couture on March 7, 2008 detailed numerous

---

[9] At least one correctional official, a Sergeant, who is in charge of supervising the correctional officers, thought the training was not helpful because it was "above us," and he apparently failed to understand it.  (Ex. 8, Loizon Dep. Tr. at 13:19-23; 90:16-91:1).  Despite Sergeant Loizon's inability to follow the Psych training that other officers thought was too basic, he is often the *only* Sergeant supervising the "Psych" tiers in Division 10.  (Ex. 8, Loizon Dep. Tr. at 57:24-58:12.)

[10] The Isaac Ray Center is the contractor that Defendants have retained to provide the mental health services at the CCJ.

steps that would be required for such a "radical change" that would "greatly impact the medical and nursing care delivery model at Cook County Jail."  (Exhibit 11 at CCSAO 992, 1000.)  Dr. Couture also specifically stated that the Divisions that the RTU detainees were being transferred to had "large limitations," that would negatively impact treatment, including "group therapy." (*Id*. at CCSAO 992.)

As foretold by one of these warnings, the Isaac Ray staff was ignored by Defendants, and in particular Defendants Dart and Godinez.  (Exhibit 12 at 2 (Feb. 7, 2008 letter from Dr. Carrington to Dr. Couture listing out the minimum necessary steps, and stating: "Although CCDOC voices their agreement and intention to comply with a number of the requirements we have communicated to them, I am not optimistic that they will be enacted by the proposed transfer date of March 1, *if ever*."  (emphasis added).)

Indeed, many of these "requirements" were not implemented, and as direct result, the Class was harmed.[11]  As Dr. Carrington put it:

> Our only intention is to provide the level of care that is constitutionally required . . . ***If we fail to provide the required level of care, I am concerned for the well-being of our severely and persistently mentally ill population and feel strongly that the County's exposure to liability from civil and Federal suits will increase dramatically***.

(*Id.* (emphasis added).)

Furthermore, as noted above, after the move the number of group therapy sessions has significantly declined, the suicide attempt rate has gone up "significantly," there was been a significant increase in violence and fights, there is no longer round the clock mental health

---

[11] On December 3, 2009, one day prior to the filing of this Motion, Appointed Counsel deposed three correctional officers, Officers Bobzin, Kelly, and Carbone.  All three of these officers testified that numerous specific issues identified by the Cermak mental health staff as "requiring" change in Division 10 were still not changed at present, approximately one and a half years after the RTU move occurred.  This includes issues that the Cermak staff identified would create serious suicide risk and endanger the health and welfare of the detainees.

specialists available, and individual therapy is almost non-existent.  The volume of documents

and evidence demonstrating Defendants' wrongful conduct and harm to the Class are too

voluminous for this Motion, but two examples of such documents will be briefly discussed.

First, in a letter dated May 30, 2008, after the RTU transfer, the Isaac Ray Center stated

that they had provided repeated written notices of the steps that *needed* to be made *before* the

RTU move, but which had not been made.  (Exhibit 13 at 2; *see also* Group Exhibit 10 (copies of

those specific written requirements that were ignored).)  Because of Defendants' failures to take

these necessary steps, the Class members were harmed and were deprived of mental health

treatment.  Some of the many examples of Defendants' failures identified in this May 30, 2008

letter are:

- "Mentally ill detainees are being sent to non-mental health treatment units causing them to go ***without treatment and be lost to follow-up***."  (*Id.* (emphasis added).)

- "Given the physical layout in Division X, *in order to provide a safe environment for this level of mentally ill detainee, the **doors need to be taken off the cells and an officer needs to be present in the day room at all times to provide direct observation***."  (*Id.* (emphasis added).)

- "General population detainees without mental illness are being housed with mentally ill detainees."  (*Id.*)

- "Upper bunks need to be removed as these detainees are on medications that can cause vertigo, balance problems and drop in blood pressure.  ***There have already been several falls requiring medical treatment***."  (*Id.* at 3 (emphasis added).)

A second example is an internal study conducted by the Isaac Ray Center concluded that

the mental health of the detainees has been undermined by the transfer from the RTU to

Divisions 10 and 2.  (Exhibit 14.)  That study determined that the number of visits to the

intensive care unit (essentially the mental health hospital) had *doubled* since the RTU transfer

(*id*. at 1), and that for the first time since data had been collected, the month of the RTU transfer

"**is the first time that the Mean Active admissions (M = 2.1 per day) has been significantly**

**higher than Inactive admissions (M = 1.6 per day)**, (*id*. at 2 (emphasis in original)).  This

internal study ultimately concluded:

> **Since the switch to the new housing system, the Male Acute care unit has seen dramatic increases in both the number of patients returning from Intermediate Care Treatment units (2-RTU & 10-RTU) and all Active patients in general.**

(*Id*. at 2 (emphasis in original).)  This increased hospitalization of the Class members is a direct

result of the Defendants' wrongful conduct.

> **B.      Inhumane conditions of confinement.**

Counts V, VI, and XI are based upon the inhumane and unconstitutional conditions of

confinement at the CCJ.  The Class is pursuing all of these Counts because they apply to all

detainees at CCJ.  These claims are all based upon the same general facts.  (TAC at ¶¶ 56-72.)

Such facts include Defendants' failure to:  provide sanitary conditions; prevent or correct rat and

insect infestation; provide laundry service or clean cloths or linens; correct heat issues and air

quality issues; and many other problems.  (*Id*.)

> **1.      Defendants fail to provide satisfactory uniform and linen exchange.**

The evidence already adduced in this case demonstrates that the class members have been

exposed to similar wrongdoing that can be proven on a class wide basis.  For example, Lynette

Taylor testified that she was aware of the fact that the detainees did not receive clean uniforms or

linen for a period of at least 4-5 weeks on one occasion despite constant complaints by the

detainees and concerns by Ms. Taylor and her supervisors that caused them to reach out to CCJ

officials to try to correct the problem.  (Ex. 1, Taylor Dep. Tr. at 57:9-59:14; 176:9-11.)  Despite

the severity of this problem, even Ms. Taylor acknowledged yet another significantly extended

period occurred where the lack of clean linens was a problem.  (*Id*. at 206:4-18.)  Named

Plaintiffs are aware of many other such prolonged situations, and indeed, the failure to receive

clean uniforms and linens on a weekly basis is the norm.  (Perconti Dep. Tr. at 167:8-168:8 (stating that for the first 10 months in Division 10, they received clean clothes perhaps 10-12 times, or about once a month); *see also* Ex. 8, Loizon Dep. Tr. at 57:16-23 (agreeing that there are likely numerous examples in the watch commander logs where recreation or linen exchange was cancelled due to staff shortages).)  In fact, when told about the five week period without a change in uniforms, one officer indicated he was not surprised to hear that, given the problems the CCJ has with uniform and linen exchange.  (Ex. 5, Hand Dep. Tr. at 227:10-15.)

Moreover, the "clean" clothes and linens are not clean at all—they are frequently raggedy, stained, in poor conditions, and inadequately sized.  (Ex. 4, Steffan Dep. Tr. at 55:7-58:4 (stating that the uniforms and linens frequently are "tattered," "have stains on them," "are of inadequate sizes," and are "faded and worn"); Ex. 5, Hand Dep. Tr. 223-230, 238:18-23, 240:2-3; Ex. 7, Cashen Dep. Tr. at 61:6-18, 62:1-2, 159:20-24).)  The "clean" linens and uniforms are "dirtier sometimes than the ones you put in . . . [t]hey don't appear to be washed.  There's hairs on them.  Sometimes you'll see blood stains.  Other times they'll be ripped and not big enough to fit the bed."  (Perconti Dep. Tr. at 168:14-21.)  This happens so frequently, that Mr. Perconti has simply started washing the linens himself, because it is pointless to request new linens that will just have the same problems.  (*Id*. at 168:22-169:3.)  Further, the testimony demonstrates that these major linen and clothing exchange problems span across all Divisions at the CCJ, because all uniforms and linens go to Division 5 for processing, and all the Divisions rely on the same third-party vendor for this service.  (Ex. 7, Cashen Dep. Tr. at 63:20-65:18 (discussing the fact that all divisions send their uniforms and linen to a central location where it then goes to the vendor); Ex. 4, Steffan Dep. Tr. at 55:7-56:21 (stating his opinion that the vendor does an inadequate job).)

### 2. Defendants fail to provide adequate temperature control leading to excessive conditions.

Similarly, the witnesses have uniformly testified about the temperature control problems at CCJ, which impacts all detainees.  (*See, e.g.*, Ex. 1, Taylor Dep. Tr. 64:15-65:6; Ex. 4, Steffan Dep. Tr. at 17:2-15 (stating that the temperature is not adequate in the building because half the tiers will be too cold and half too hot); Ex. 5, Hand Dep. Tr. at 219-221 (discussing 15 day period of time in December of 2008 when the heat was not working and the tiers were very cold); Loizon Dep. Tr. at 74:7-10 (stating the tiers are cold in the winter time); Ex. 7, Cashen Dep. Tr. at 41:10-13 (stating that both the Divisions he has worked in recently (Divisions 10 and 9) have heating problems, although Division 10 seems to be worse); Ex. 6, Mass Dep. Tr. at 47:15-21 (noting the temperature problems).  Indeed, during the depositions of the named Plaintiffs in this case, in the first week of May 2009, the temperature in the room in which Mr. Perconti was deposed was "blazing hot."  (Perconti Dep. Tr. at 161:4-5.)

Officer Cashen, who deals with the facilities group that operates the heating and air condition systems in Division 10, stated that he personally finds the temperatures excessively cold or hot frequently, and complains to facilities, who sometimes are unable to rectify the problem.  (Cashen Dep. Tr. at 48:6-52:8.)  The problem is so severe that many officers feel compelled to wear their winter jackets inside during their shifts, which they are allowed to do, yet detainees are not allowed to have or wear jackets despite the frigid conditions.  (*Id*. at 51:14-52:8 (stating that detainees are not allowed to wear jackets, but officers routinely wear jackets inside because of the cold).)

### 3. Rodents, pests, and other "deplorable" conditions that Defendants fail to correct.

Rodents and other pests are a major issue at the CCJ.  Numerous witnesses indicated that they would agree with the statement that "rodents and insects are a common part of everyday life

in Cook County Jail."  (Ex. 5, Hand Dep. Tr. at 237:4-20; Ex. 4, Steffan Dep. Tr. at 121:20-122:21; Ex. 2, Walker Dep. Tr. at 120:17-23 (has heard that some divisions have rodent infestations).).  The conditions in general are "very deplorable."  (Ex. 2, Walker Dep. Tr. at 114:15-16, 121:14-122:4 (stating the "sanitation is horrible," "the conditions are very deplorable" in the intake area, it is either "too cold or too hot," "the vents have a lot of black soot on it, so it's very deplorable"); Ex. 1, Taylor Dep. Tr. at 64:6-9 (agreeing that the conditions were dirty in the cells); Perconti Dep. Tr. at 115:17-116:14.)

Defendants fail to take appropriate steps to clean the cells.  Indeed, for over half a year, Mr. Perconti's cell was only power-washed on a couple occasions until Superintendent Miller was appointed and began power-washing every couple of weeks.  (Perconti Dep. Tr. at 165:18-166:16.)  Moreover, Defendants have stopped allowing detainees to have access to cleaning supplies, so they cannot even clean their cells on their own to prevent these filthy and harmful conditions.  (Perconti Dep. Tr. at 169:8-15.)  The general filthy conditions of the CCJ have led to mass disease amongst the inmates, which actually caused the Plaintiffs' depositions to be delayed.  (*See generally* Hill Dep. Tr. at 138:20-139:10; Perconti Dep. Tr. at 162:22-163:3.)

The general conditions of the jail are also in disrepair and hazardous.  During the process of deciding whether to move the RTU detainees to Division 10, the Isaac Ray Center staff toured Tier 2A of Division 10.  After that tour a memorandum was generated strongly criticizing the dangerous conditions present in that tier.  Specifically, Dr. Brar stated: "the area contained an overwhelming amount of hazardous and physically dangerous physical plant deficiencies that would place any detainee, particularly one identified as having psychiatric impairment, at an incredible risk for harm."  (Exhibit 15 (listing out specific issues and dangerous conditions present in a Division 10 tier).)

### 4.    Medicated detainees are forced to sleep on the concrete floors for 11-12 hours a day, leading to severe physical injuries.

Numerous witnesses have testified regarding the problems with forcing medicated inmates to sleep on concrete floors (which has led to severe physical injuries to the named Plaintiffs and class members).  (Ex. 2, Walker Dep. Tr. at 88:8-16; Ex. 4, Steffan Dep. Tr. at 59:15-60:2.)  The mental health detainees are all on strong medications, many of which cause severe drowsiness.  (Ex. 4, Steffan Dep. Tr. at 58:14-60:4 (noting that many inmates become drowsy after receiving their medication and ask to sleep in their beds but are denied that right and instead are forced to sleep on concrete for hours); Perconti Dep. Tr. at 147:6-23; Haynes Dep. Tr. at 150:2-151:10.)  Yet, detainees are not allowed to lay down in their beds after receiving their medication, and instead are forced to lay down on concrete—they cannot bring out their mattresses, and have even been denied for weeks and months the right to use blankets to try to soften the sleeping conditions.  (*Ibid*.; *see also* Ex. 4, Steffan Dep. Tr. at 84:15-18 (stating that Defendant Figliulo prohibited the detainees from brining mattresses out of their cells); Perconti Dep. Tr. at 147:24-148:12 (no longer allowed to even use blankets); Haynes Dep. Tr. at 150:15-151:3 (same).)  Defendants have acknowledge this is a major problem, but instead of correcting the core problem by providing a humane place for the drowsy medicated detainees to sleep—have merely reduced the time that detainees were forced to sleep on concrete floors by one hour—from 12 hours a day to 11 hours a day.  (Ex. 16, Miller Dep. Tr. at 112:23-115:2 (noting the detainees complained about not having access to their beds, and stating the only corrective measure was to let them back in their cells for an extra hour); Perconti Dep. Tr. at 127:19-128:12.)

C.      **Interfering with the grievance process and obstructing access to the courts.**

Counts XV to XX are based upon all Defendants' obstruction with Plaintiffs and the class's right to access the grievance procedures, and the courts.  This includes acts of retaliation against the Named Plaintiffs for filing this lawsuit.  (TAC at ¶¶ 86-94.)  The facts supporting these claims are common to the class, namely Defendants' telephone and law library policies (*id.* at ¶¶ 205-17), and the common practices relating to the grievance process, including the fact that the grievance form specifically allows grievances to be changed to requests, which entirely thwarts the grievance process (*id.* at ¶¶ 73-74).  (*See also*, *infra*, at 24-25.)

D.      **Counts that cover all three categories.**

Counts VII and VIII are against certain Defendants for their failure to train or supervise, which led at least in part to the wrongs and harms alleged in the Third Amended Complaint.  Thus, these causes of action serve as an umbrella covering the wrongful conduct in all three categories discussed above.  Similarly, Count XVII covers all wrongful conduct because it is based on Defendant Dart's voluntary assumption of a duty to Plaintiffs and the class to meet certain minimum standards that are at least as stringent, if not more so, than constitutional minimum standards, which have not been met for all three categories of claims.

## II.     The New Class And Subclass Definitions.

As noted above, this Court's July 29, 2009 Opinion concluded that the class definition was too vague, and that the class failed to specify the injunctive relief sought.  (Class Cert. Opinion at 20-21.)  Plaintiffs filed their Third Amended Complaint on October 26, 2009.  (Docket Entry #144.)  The changes from the Second Amended Class Action Complaint to the Third were intended to address the two issues raised by this Court's July 29, 2009 Order.  The Third Amended Complaint now defines the class to include *all* detainees at the CCJ regardless of

their particular mental health classification.  (TAC at ¶ 100.)  Specifically, the Class is now

defined as:

> All current, former, and future pretrial detainees housed at CCJ from August 25,
> 2006 to the present (the "Class Period").

(*Id.*)[12]  This new Class definition assures that all pretrial detainees, whether "mentally ill" or

"Psych" classified or not, will receive notice of this lawsuit, and is also consistent with testimony

already adduced in this case that the environmental conditions of confinement challenged by

certain Counts are substantially similar throughout all Divisions of the CCJ.  The condition of

confinement claims alleged by the Class apply equally to all detainees, and therefore, this new

Class definition is appropriate.

The Third Amended Complaint also contains four subclasses focused on other Counts

that only apply to some of the Class members.  These subclasses are alleged as:

The "Mental Health Injunctive Relief Subclass," which is defined as:

> All current, former, and future pretrial detainees housed at CCJ
> during the Class Period who were classified as "Psych" detainees
> by the Defendants or who otherwise qualify as "mentally ill" as
> defined below.
>
> For purposes of the Mental Health Injunctive Relief Subclass,
> "mentally ill" shall be defined to include all current, former, and
> future pretrial detainees who:  (1) have been diagnosed by any
> mental health professional with any condition that would qualify
> that detainee to be classified as "Psych" under the criteria for that
> classification as established in this litigation; or (2) as part of the
> injunctive relief in this case, all current and future Class members
> housed at the CCJ will be given a mental health screening by a
> licensed professional, at Defendants' expense, and any such Class
> Member that is diagnosed with a mental health condition that

---

[12] Excluded from the class and subclasses are all present and former agents of Defendants during
the Class Period; all present and former employees of Defendants during the Class Period; any
Class member(s) who timely elect(s) to be excluded from the Class as allowed by Rule 23(b)(3)
or this Court's Orders; and all members of the judiciary of this Court, and members of their
immediate families.  (*Id.* at 104.)

qualifies them to be classified as a "Psych" detainee will be a member of this Mental Health Injunctive Relief Subclass.

The "Mental Health Damages Subclass," which is defined as:

> All current and former pretrial detainees housed at CCJ during the Class Period who were classified as "Psych" detainees by the Defendants at any time while they were housed at the CCJ.

The "RTU Subclass," which is defined as:

> All members of the Mental Health Damages Subclass that were also housed in the Residential Treatment Unit ("RTU") of Division Eight of the Cook County Jail ("CCJ") that were transferred to non-RTU Divisions as part of Defendants' decision to transfer all such detainees out of the RTU in or about May of 2008.

The "Grievance Subclass," which is defined as:

> All current, former, and future pretrial detainees housed at CCJ during the Class Period who filed a grievance that was either processed as a request or improperly processed in violation of the CCJ's policies and procedures, or other governing rule, regulation, statute, law, or constitutional provision.

(TAC at ¶ 102.)  Notably, the mental health-related subclasses use the Defendants' own classification criteria of "Psych," to identify members of those Subclasses.  The "Psych" Classification is codified in Defendants' formal policies and procedures.  (Exhibit 17 (Division 10 Procedure 10-45.)[13]  Moreover, the Cermak Mental Health staff have developed a list of criteria for determining when a detainee "requires" intermediate level of clinical care and supervision, and these objective criteria can also be used.  (Exhibit 18 (March 6, 2008 memo from Dr. Carrington to Dr. Couture).)  As more fully discussed below, these new class and subclass definitions cure the issues previously identified by this Court.

---

[13] Division 10 Procedure 10-45 indicates it is "related" to General Order 7.4, yet General Order has still not been produced in this case, nor have the divisional policies for the other divisions of Cook County Jail.  Accordingly, Plaintiffs can only assume that the General Orders and other divisional procedures contain similar language, and reserve all rights regarding Defendants' deficient document production.

## ARGUMENT

**I.      The Class And Subclasses Are Sufficiently Defined.**

The new Class and Subclass definitions described above are sufficient.  Each of those definitions will allow this Court to determine who is a member of the relevant Class or Subclass at any point in time based upon objective criteria.  As this Court stated, a class is sufficiently defined "so long as it is defined by objective criteria, so that it is administratively feasible for the court to determine whether a particular individual is a member."  (Class Cert. Opinion at 6 (citations omitted).)  The new Class definition includes *all* detainees at CCJ during certain periods of time, which can be ascertained from Defendants' records.

The two mental health-related subclasses are likewise defined based upon objective criteria contained in Defendants' records, namely a list of detainees that are classified as "Psych."  As noted above, the Defendants' own policies define the "Psych" classification and indicate that such a classification requires the detainee to be confined in certain "Psych" classified tiers in CCJ.  (Exhibit 17; *see also* Exhibit 19 (list of tier classifications for Division 10).)  To the extent that there are class members who should have been classified as "Psych" but were not, those class members would be part of the Mental Health Injunctive Relief class.  Accordingly, to the extent that they are in the CCJ after that injunctive relief becomes effective, they would receive a new screening that would determine they were "Psych" detainees, which would then require Defendants to provide such detainees with the mental health treatment they require (which the Defendants are currently failing to provide).[14]

---

[14] Because such misdiagnosed detainees would not be part of the Mental Health Damages Subclass, they would have the right to sue for damages at a later time so their rights would be protected.

The RTU Subclass is also sufficiently certain, indeed it will be quite easy for the

Defendants to identify the detainees that were moved from the RTU to Division 10 or Division 2

in or about May of 2008 when the RTU Division 8 building was closed to "Psych" detainees.

Finally, the Grievance Subclass is also sufficiently certain and can be identified by objective

criteria, namely all Class members who filed a grievance that was either processed as a request

or improperly processed.  Defendants can provide a list of all detainees that filed grievances

during the class period, and determine which of those grievances were processed as a request,

and all such detainees would be members of this subclass.

## II.     The Proposed Class And Subclass Meet All The Requirements Of Rule 23(a).

### A.     Numerosity, commonality, and typicality are met.

This Court previously ruled that Plaintiffs satisfied the requirements of Rule 23(a)(1), (2),

and (3).  (Class Cert. Opinion at 9-13.)  The reasoning of that prior Order applies equally well

the to amended class definitions, each subclass independently satisfies the numerosity

requirement and the new class definition captures all detainees, which will number more than

100,000 given that Defendants' own statistics indicate that there are at least 9,000 detainees a

day, and nearly 100,000 detainees per year.  (TAC at ¶¶ 108-09; *Ramirez v. Palisades Collection

LLC*, 250 F.R.D. 366, 370 (N.D. Ill. 2008) (Conlon, J.) (citation omitted).)  Similarly,

commonality and typicality are met for the same reasons as articulated previously.  (First Class

Cert. Mem. at 6; Class Cert. Opinion at 11-13.)

### B.     Plaintiffs Are Adequate.

As this Court noted in its prior Order, Defendants did not challenge the adequacy of class

counsel, and Defendants' challenges as to the named Plaintiffs' adequacy failed.  (Class Cert.

Opinion at 13-14.)[15]  This Court, however, determined that it was premature to analyze whether

there were any conflicts between named Plaintiffs and the putative class.  (*Id*. at 14 (citation

omitted).)  Plaintiffs respectfully submit that the new class definition allows for that analysis, and

demonstrates that there are no such conflicts.  Named Plaintiffs' claims are identical to the

claims of the class, they have been exposed to nearly identical conditions of confinement and

treatment (as further discussed below), and the Named Plaintiffs have shown that they will

vigorously prosecute this action as best exemplified by the time and effort they expended in

drafting a high quality *pro se* complaint, and successfully moving this Court for appointed

counsel.  Moreover, Plaintiffs actively communicate with appointed counsel, research and review

case law on their own, and are very active and highly engaged in this litigation.  Plaintiffs also

have suffered substantial injury and harm from Defendants' wrongful conduct, and thus will

vigorously prosecute this litigation.  As such, they are adequate.  *Ramirez*, 250 F.R.D. at 372

(noting the touchstone of adequacy is whether plaintiff is sufficiently interested in the outcome

of the litigation to ensure vigorous litigation).

**III.    Class Certification Is Also Appropriate Under Each Of The Three Rule 23(b) Subprovisions.**

    **A.    Certification under Rule 23(b)(3) is appropriate.**

As this Court has noted, where certification is appropriate under the more stringent

requirements of Rule 23(b)(3), there is no need to address the requirements of Rule 23(b)(1) or

23(b)(2).  *Walker v. Bankers Life & Cas. Co.*, 2007 U.S. Dist. LEXIS 73502 at *19-20 (N.D. Ill.

Oct. 1, 2007) (Conlon, J.) (granting motion to certify class under Rules 23(b)(1)-(3) because the

---

[15] For this reason Plaintiffs have not reargued the Rule 23(g) issue, or reattached the supporting affidavit from Appointed Counsel to this Memorandum.  To the extent this Court deems those arguments or affidavit necessary, Plaintiffs refer to and incorporate herein their prior Affidavit and Memorandum of Law on that point.

class met the Rule 23(b)(3) requirements). Although Plaintiffs will briefly address Rules 23(b)(1) and 23(b)(2) below, given that this case should be certified under Rule 23(b)(3), the requirements of Rule 23(b)(3) will be addressed first.

In order to certify a class under Rule 23(b)(3) Plaintiffs must demonstrate that common issues will predominate and that a class action is superior to other available methods of resolving the controversy. *Ramirez*, 250 F.R.D. at 372 (citations omitted). The objective of the predominance and superiority requirements of Rule 23(b)(3) is "the promotion of economy and efficiency." *Id*. (citation omitted).

As set forth below, both elements are met here and certifying this class will greatly promote economy and efficiency.[16]

### 1. Predominance is met.

The predominance requirement is met when "there exists generalized evidence that proves or disproves an element on a simultaneous, class-wide basis, obviating the need to examine each class member's individual position." *Ramirez*, 250 F.R.D. at 372 (citation omitted). Here, there are numerous common issues presented in this case that can be resolved with generalized evidence that will not vary based upon each class member's individualized circumstances. In fact, as discussed above, the evidence already adduced in this case

---

[16] As Plaintiffs noted in their prior Reply brief in support of their initial motion for class certification, given the fact that these Defendants have affirmatively interjected the *Duran and Harrington* Consent Decrees into this case to attempt to shield their wrongdoing, it would be appropriate for this Court to find that the Defendants are estopped from challenging class certification because they have represented that class treatment of these types of claims is appropriate with regard to those cases. *Cf. Carnegie v. Household International, Inc.*, 376 F.3d 656 (7th Cir. 2004) (discussing the doctrine of judicial estoppel in the context of class certification issues and affirming class certification where defendants had previously consented to certification for settlement purposes only to reverse course when they had an "opportunistic change of heart"). Indeed, unless Defendants can point to a specific manageability issue that would differentiate this case from a settlement type class situation, there is no logical basis to find that a class action is not warranted here.

demonstrates the uniform treatment of the Class members, and the equally uniform constitutional violations occurring at the CCJ. (*See*, *supra*, 2-16.)

The core issues in this case relate to three issues or categories of issues: (1) failure to provide adequate mental health treatment, including suicide prevention; (2) exposing Plaintiffs and the class to inhumane conditions of confinement; and (3) interfering with the grievance process and obstructing access to the courts.

### a.     Common mental health issues predominate.

The mental health treatment and suicide prevention claims are based upon Defendants' uniform policies and procedures, including the policies attached hereto as group at Exhibit 20.[17] As one of Defendants' senior Mental Health Specialists testified that she was trained to comply with the Cermak policies and procedures in carrying out her duties, and she was trained to treat all detainees equally, in compliance with those policies. (Ex. 1, Taylor Dep. Tr. at 52:17-53:2.) Ms. Taylor further testified that all the detainees she treats receive similar treatment consistent with the Cermak policies. (*Id*. at 53:11-14.) Furthermore, as discussed at length above, the deposition testimony and discovery in this case establishes that Defendants can be found liable based upon generalized evidence that will apply to all Class members. (*See*, *supra*, at 2-11.)

### b.     Common conditions of confinement predominate.

The conditions of confinement raise common issues that predominate. The class members are all housed in the CCJ and accordingly are subjected to nearly identical conditions of confinement. In fact, it is difficult to imagine circumstances where class members were exposed to more identical conditions. Certainly, Defendants' employees that have testified in this case have been unable to come up with any substantive differences. (Ex. 1, Taylor Dep. Tr.

---

[17] The attached policies are the *only* policies that have been produced to Plaintiffs relating to these issues despite the existence of more than a hundred additional Cermak policies.

at 55:1-57:7 (stating that she could not distinguish between the conditions in Divisions 6, 9, 10, and 11 except that some are two levels); Ex. 7, Cashen Dep. Tr. at 41:1-24 (stating that the conditions between Division 9 and 10 are the same, including both having temperature problems, but Division 10 has perhaps more temperature problems); Ex. 4, Steffan Dep. Tr. 16:14-21 (stating the environmental conditions did not differ from tier to tier or division to division); Ex. 16, Miller Dep. Tr. at 20:1-3 (no difference in the conditions of the cells in Divisions 1, 5, 9, and 10; *id*. at 29:9-15 (change of uniforms and linens identical between Division 10 and Division 1);

The common nature of the conditions of confinement is bolstered by the fact that inmates are grouped into tiers based upon certain classifications, which creates even more uniformity. (*E.g.*, Exhibit 19, Division Ten Inmate Housing Assignment).)  Moreover, as with the mental health treatment issues, the conditions of confinement are governed by official policies that are uniform in nature, some of which are attached hereto as a group at Exhibit 21.  (*See also* Ex. 4, Steffan Dep. Tr. at 15:13-19; 30:10-13 (testifying that as a correctional officer he is trained to comply with such policies, and trained to treat all detainees the same).)  The common question of whether these policies are constitutional will predominate any individualized issues, as will the common question of whether Defendants comply with the standards set by these policies.

Furthermore, as demonstrated above (*see*, *supra*, 11-16), there is already substantial generalized evidence showing that:

- The Defendants clothing and linen exchange is unconstitutional, in that the clothes and linens are not properly cleaned, and are not exchanged frequently enough (including several prolonged periods of more than a month);

- There are uniform temperature control problems at the CCJ.  Often some tiers are too hot, and others are too cold to the point that both detainees and correctional officers complain.  Correctional officers are allowed to wear jackets in the cold tiers, but detainees are not.

- The conditions at CCJ are "deplorable" according to Defendants' own employees, and rodents and pests are a major problem at the CCJ.  (*Supra* at 13-14 (citing, *inter alia*, Ex. 2, Walker Dep. Tr. at 114:15-16; 121:14-122:4 (calling the

conditions "deplorable," stating the "sanitation is horrible," and the conditions are "very deporable," in some areas).)  The Defendants fail to take adequate steps to clean these "deplorable" conditions.  (*Id.*)

- The Defendants force the mentally ill detainees to sleep on concrete floors, even after they are medicated with potent drugs that make them drowsy.  The Defendants even refuse to allow the detainees to use their blankets to try to soften the concrete bed that they are forced to lay on for hours (11 to 12 hours a day).  (*Supra* at 14-15.)

**c.      Common grievance and access issues predominate.**

Similarly, common issues predominate with regard to the third category of claims.  The grievance procedure at the CCJ is established by a uniform policy (*See* Exhibit 22, Defendants' Response to Request 8 (admitting a uniform grievance procedure policy exists); Exhibit 23 (grievance policy of the CCJ)).  Defendants' telephone and law library access policies are similarly uniform.  (Exhibit 24 at 2 (stating that all detainees have the right to, *inter alia*, "[c]onfidential access to the courts," "[t]he right to consult with legal counsel by mail, **telephone**, or personal interview," and to "[p]articipate in the use of the law library reference materials to assist in resolving legal problems") (emphasis added); *id*. at 9 (outlining law library services, including fact that each law library session should be a minimum of 1.5 hours, and that such sessions are limited to one per week).)  Defendants routinely fail to comply with those policies, and deprive the Class members of their right to access the courts by, among other things, improperly processing grievances as requests, and denying Class members the right to confidentially discuss their cases with their attorneys.  (*See generally* Perconti Dep. Tr. at 70:3-94:7 (discussing grievances improperly treated as "requests," grievances going missing or rejected as duplicates, officers threatening Perconti for filing grievances, and employees refusing to accept grievances on plain form, which violates policy).)

Accordingly, the common questions presented by these grievance procedure and access to the court claims predominate over any individualized issues.

### d.     All claims involve common questions of whether Defendants violated the Class member's constitutional and other rights.

With regard to all three categories of claims discussed above the question of whether the Defendants violated the class member's constitutional rights with deliberate indifference will focus on the Defendants' actions, conduct, and mindset, and not that of the class members. Thus, this element of the claims will be established by generalized evidence.

Not surprisingly, numerous courts have certified class actions that raised similar issues based on similar causes of action.  In this Judicial District alone there is a legion of such cases. *Harper v. Sheriff of Cook County*, 2008 U.S. Dist. LEXIS 43777 (N.D. Ill. May 29, 2008) (certifying Rule 23(b)(3) damages class of inmates asserting Section 1983 claims based upon jail's intake procedures); *Phipps v. Sheriff of Cook County*, 249 F.R.D. 298, 302 (N. D. Ill. 2008) (certifying Rule 23(b)(3) damages class of paraplegic or partially paralyzed pretrial detainees who asserted claims, including Section 1983 claims, based upon the jail's alleged discrimination against them by reason of their handicap); *Vodak v. City of Chicago*, 2006 U.S. Dist. LEXIS 30052 at *44-45 (N.D. Ill. Apr. 17, 2006) (certifying class of war protesters that claimed various constitutional rights were violated when they were arrested and detained, including conditions of confinement claim, under Rule 23(b)(3) because common issues predominated); *Dunn v. City of Chicago*, 231 F.R.D. 367, 376-78 (N.D. Ill. 2005) (certifying 23(b)(3) damages class of post-arrest detainees asserting Section 1983 claims based upon claims including conditions of confinement, finding that common issues of the conditions predominated).[18]

---

[18] *See also Young v. County of Cook*, 2007 U.S. Dist. LEXIS 31086 at *27 (N.D. Ill. Apr. 25, 2007) (certifying Rule 23(b)(3) damages class of pretrial detainees at Cook County Jail that brought claims under Section 1983 based upon the jail's strip search policy); *Calvin v. Sheriff of Will County*, 2004 U.S. Dist. LEXIS 8717 *3-5 (N.D. Ill. May 17, 2004) (certifying 23(b)(3) liability strip search sub-classes); *Johns v. DeLeonardis*, 145 F.R.D. 480, 484-85 (N.D. Ill. 1992) (certifying 23(b)(3) damages class of 25 detainees that alleged their constitutional rights were

## 2.      Superiority is met.

Courts consider several factors in determining whether the superiority requirement of

Rule 23(b)(3) is met.  *Ramirez*, 250 F.R.D. at 373.  These factors include:  (a) the interest of

members of the class in individually controlling the prosecution or defense of separate actions;

(b) the extent and nature of any litigation concerning the controversy already commenced by or

against members of the class; and (c) the desirability of concentrating the litigation of the claims

in the particular forum; and (d) the difficulties likely to be encountered in the management of the

class action.  *Id*. (citation omitted).  As noted above, the touchstone to determining if the

superiority requirement is met is whether the class action will promote economy and efficiency.

*Id*. at 372.  Here, all these factors weigh in favor of certifying this class.

First, none, or very few, of the individual class members would be able to afford counsel

to pursue individual claims.  Further, many of the class members may not be aware of their

constitutional rights.  Thus, the class members are best served by allowing Appointed Counsel in

this case to collectively pursue these actions in this case.  Second, Defendants have not

demonstrated that any other cases have been filed or are pending that raise the identical claims

based upon the identical facts presented in this action.  Third, it is desirable to have this litigation

in this forum because it involves the CCJ, which is located within this Judicial District (it is

unlikely any other venue would be proper).  Fourth, it is unlikely any significant manageability

issues will be presented in this case given the high degree of predominating common issues as

---

violated when they were strip searched after a raid of an organization); *Rahim v. Sheahan*, 2001
U.S. Dist. LEXIS 17214 at *50-53 (N.D. Ill. Oct. 19, 2001) (certifying 23(b)(3) class of pre-trial
detainees at the CCDC based on policies regarding their treatment when taken to the hospital for
medical treatment); *Gary v. Sheahan*, 1999 U.S. Dist. LEXIS 5616 at *4-8 (N.D. Ill. Mar. 31,
1999) (denying motion to decertify class, finding that class of inmates exposed to a blanket strip
search policy met the 23(b)(3) criteria regardless of individualized issues of damages).

discussed above.  In sum, the superiority requirement is met here, and the certification of this

case as a class will promote economy and efficiency.  *Ramirez*, 250 F.R.D. at 372, 373-74.

> **B.     Certification is also appropriate under Rules 23(b)(1) and (b)(2).**

Given that Plaintiffs have established that a class should be certified under the more

stringent standards of Rule 23(b)(3), there is no need to address the requirements of

Rule 23(b)(1) or 23(b)(2).  *Walker*, 2007 U.S. Dist. LEXIS 73502 at *19-20 (N.D. Ill. Oct. 1,

2007) (Conlon, J.) (granting motion to certify class under Rules 23(b)(1)-(3) because the class

met the Rule 23(b)(3) requirements).  In any event, Plaintiffs also satisfy the requirements for

class certification under Rules 23(b)(1) and 23(b)(2).

As a threshold issue, this Court already noted that this case appeared ideal for class wide

equitable relief.  (July 29, 2009 Order at 15.)  This Court's statement is consistent with a legion

of cases.  As one federal judge recently concluded:

> Finally, courts routinely certify class actions involving prisoners, including cases
> challenging prison health care, mental health care, and dental care.  *See, e.g.*,
> *Ramos v. Lamm*, 639 F.2d 559, 562, 577 (10th Cir. 1980) (certifying class of "all
> persons who are now or in the future may be incarcerated in the maximum
> security unit" to challenge constitutionally inadequate mental health care);
> *Penland v. Warren Co. Jail*, 797 F.2d 332, 333-35 (6th Cir. 1986) (certifying
> (b)(2) class of "present and future prisoners" to challenge conditions of
> confinement, including health care); *Bradley v. Harrelson*, 151 F.R.D. 422, 425-
> 27 (M.D. Ala. 1993) (certifying (b)(2) class of seriously mentally ill prisoners to
> challenge adequacy of mental health services); *Robert E. v. Lane*, 530 F. Supp.
> 930, 941-44 (N.D. Ill. 1981) (certifying (b)(2) class of "all persons who are or will
> be incarcerated at Stateville and who need or will need mental health services");
> *Dean v. Coughlin*, 107 F.R.D. 331, 332-35 (S.D.N.Y. 1985) (certifying (b)(2)
> class of "all persons who are or will be inmates" to challenge inadequate dental
> care); *Jones 'El v. Berge*, 2001 U.S. Dist. LEXIS 25625, 2001 WL 34379611, at
> *12-13 (W.D. Wis. 2001) (certifying 23(b)(2) class of prisoners subject to
> "systemic" unconstitutional conditions of confinement, including inadequate
> medical, mental health, and dental care); *see also Hassine v. Jeffes*, 846 F.2d 169,
> 175-80 (3d Cir. 1988) (certifying 23(b)(2) class of prisoners challenging
> conditions of confinement).

*Flynn v. Doyle*, 2007 U.S. Dist. LEXIS 22659, at * 9 (E.D. Wis. Mar. 14, 2007) (certifying

23(b)(2) class and subclass, that included "all individuals with disabilities"); *see also Bzdawka v.*

*Milwaukee County*, 238 F.R.D. 469, 474 (E.D. Wis. 2006) (certifying 23(b)(2) class consisting of disabled Milwaukee County residents).

This Court, however, denied Plaintiffs' prior motion to certify this case as a 23(b)(1) or 23(b)(2) class because this Court determined that Plaintiffs had failed to sufficiently specify the injunctive relief sought.  (July 29, 2009 Order at 13-19.)  This Court also noted that specifying the injunctive relief sought in this case would be complicated by the existence of the *Harrington* and *Duran* Consent Decrees.  (*Id*. at 17-19.)

> **1.     The Third Amended Complaint sufficiently specifies the injunctive relief sought.**

The Third Amended Complaint contains very specific allegations of the type of injunctive relief sought by the class.  (*Id*.)  There are now 22 subparagraphs containing very specific requests for injunctive relief, which includes, for example, requiring the Defendants to:

- provide mental health screenings to all future detainees by independent third-party mental health professionals (Prayer for Relief at ¶ D(1));

- provide group therapy programs to "Psych" detainees (¶ D(3));

- change the procedures for the distribution of razors to "Psych" detainees, many of who are suicidal, so that razors are not distributed at night and left with such detainees unsupervised for hours (¶ D(6));

- provide "Psych" training for all correctional officers assigned to a "Psych" tier (¶ D(7));

- provide clean clothes and linens on at least a weekly basis (¶ D(18)).

The Class also seeks an order that would appoint, at Defendants' expense, an established expert in the field of correctional institution mental health treatment to serve as a monitor of Defendants' compliance with the injunctive relief ordered in this case.  (*Id*. Prayer for Relief at ¶ D(22).)  The appointment of monitors such as the one proposed are routine in these types of cases.  Such a monitor in this case would serve two important functions:  (1) providing periodic reports to the Court and Appointed Counsel regarding the conditions at the CCJ and Defendants'

compliance with the injunctive order; and (2) recommending modifications to the injunctive

order to ensure that the class is well-protected in a reasonable manner.

**2.      The *Harrington* and *Duran* Consent Decrees are not inconsistent with the relief sought by the Class.**

The thrust of the Complaint, particularly with regard to the injunctive relief, is directed at

the quality of mental healthcare provided by Defendants.  The *Duran* decree does not relate to

that issue at all, but rather deals primarily with the issue of overcrowding at the CCJ.  Similarly,

the *Harrington* decree does not relate to *qualitative* issues about mental health treatment, but

simply procedural issues, such as the staffing ratios, record keeping, and the like.  There is

nothing in the *Harrington* decree that addresses the issues raised in this action regarding suicide

prevention, Psych-training, group therapy, and other such issues of quality of treatment.

Furthermore, the *Harrington* decree is for all intents and purposes defunct.  The case was

"terminated" on November 3, 1997, and other than a recent erroneous pro se filing, there has

been no activity in the case for 5 years since 2004, and no substantive activity for over a decade

since an expert report was filed in 1998 regarding Defendants' compliance with the procedural

requirements of the consent decree.  (Exhibit 25, Pacer Report).

In sum, the specific injunctive relief sought by Plaintiffs and the Class is not inconsistent

with any of the relief specified by the *Harrington* or *Duran* Consent Decrees.  Accordingly,

neither of those decrees should preclude certification of a class under Rule 23(b)(1) or (2).

**WHEREFORE**, Plaintiffs DERRICK HAYNES, THOMAS M. PERCONTI,

CHARLES B. HILL, and FRED ROGERS, on behalf of themselves and a class of others

similarly situated, through their appointed counsel, respectfully request that the Court grant this

Motion and enter an Order certifying the class and appointing Anthony T. Eliseuson and Mark

A. Flessner as class counsel; and such further relief as this Court deems necessary and proper.

Dated:  December 4, 2009                     Respectfully submitted,

                                             /s/ Anthony T. Eliseuson
                                             One of the appointed attorneys for Plaintiffs

Mark A. Flessner (ARDC #6194599)
Anthony T. Eliseuson (ARDC #6277427)
SONNENSCHEIN NATH & ROSENTHAL LLP
233 South Wacker Drive
Suite 7800
Chicago, Illinois 60606
(312) 876-8000
(312) 876-7934 (fax)
mflessner@sonnenschein.com
aeliseuson@sonnenschein.com
*Appointed attorneys for Plaintiffs Derrick Haynes,*
*Thomas M. Perconti, Charles B. Hill, and Fred Rogers*

### CERTIFICATE OF SERVICE

I, Anthony T. Eliseuson, an attorney, hereby certify that on December 4, 2009, I electronically filed the preceding with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the following:

- **Kevin W. Frey**
  **kfrey@cookcountygov.com**

- **Richard A. Devine**
  **richard.devine@mbtlaw.com**

- **James J. Knibbs**
  **james.knibbs@mbtlaw.com**

- **Tracey A. Dillon**
  **tracey.dillon@mbtlaw.com**

/s/Anthony T. Eliseuson
Anthony T. Eliseuson